Filed 7/25/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>   Petitioner,<br><br>      v.<br><br>THE SUPERIOR COURT OF ORANGE COUNTY,<br><br>   Respondent;<br><br>RITO TEJEDA,<br><br>   Real Party in Interest. | G052932<br><br>(Super. Ct. No. 14ZF0338)<br><br>O P I N I O N |

Original proceedings; petition for a writ of mandate/prohibition to challenge an order of the Superior Court of Orange County, Richard M. King, Judge. Petition granted.

Tony Rackauckas, District Attorney, Stephan Sauer and Brian F. Fitzpatrick, Deputy District Attorneys, for Petitioner.

Schonbrun Seplow Harris & Hoffman and Paul L. Hoffman; Erwin Chemerinsky for Respondent.

Sharon Petrosino, Public Defender, and David Dworakowski, Assistant Public Defender, for Real Party in Interest.

Nearly 40 years ago, our Supreme Court reaffirmed "that Code of Civil Procedure section 170.6, which provides for the disqualification of trial judges on motion supported by an affidavit of prejudice, does not violate the doctrine of the separation of powers or impair the independence of the judiciary."[1] (*Solberg v. Superior Court* (1977) 19 Cal.3d 182, 186-187 (*Solberg*).) It did so after considering "experience with the statute [in the preceding] decades and as applied . . . in a criminal context." (*Id*. at p. 187.) The *Solberg* court reasoned, "to the extent that abuses persist in the utilization of section 170.6 they do not, in our judgment, 'substantially impair' or 'practically defeat' the exercise of the constitutional jurisdiction of the trial courts. Rather, it may be helpful to view them as a relatively inconsequential price to be paid for the efficient and discreet procedure provided in section 170.6. The statute thus remains a reasonable—and hence valid—accommodation of the competing interests of bench, bar, and public on the subject of judicial disqualification. We do not doubt that should future adjustments to this sensitive balance become necessary or desirable, the Legislature will act with due regard for the rights of all concerned." (*Solberg, supra,* 19 Cal.3d at p. 204.)

Although we question the wisdom of the *Solberg* holding in light of the complexities of modern court administration, we are bound to follow Supreme Court authority. For reasons we explain anon, we urge the Supreme Court to revisit the issue of blanket papering to determine whether the impact of an abusive use of Code of Civil Procedure section 170.6, such as demonstrated in this record, can be viewed as inconsequential on a trial court in the performance of its duty to administer justice.

No fundamental adjustments to this balance have been made by either the Legislature or the Supreme Court in the ensuing 39 years. Respondent Superior Court of Orange County (respondent court), however, refused to grant a section 170.6 motion filed

---

[1] All further statutory references are to the Code of Civil Procedure, unless otherwise indicated.

on behalf of petitioner, the People of the State of California, because the Orange County District Attorney (district attorney) invoked an improper blanket challenge to a particular judge that substantially disrupted the respondent court's operations. As interpreted by respondent court, *Solberg* did not foreclose a separation of powers challenge to the executive branch's apparent abuse of section 170.6 under the circumstances of this case.

In our view, however, *Solberg* anticipated circumstances very similar to those faced here. Rightly or wrongly, the *Solberg* court concluded the peremptory challenge at issue would not constitute a separation of powers violation. Because we are bound by the reasoning in *Solberg,* we must grant the petition for writ of mandate.

PROCEDURAL HISTORY

In December 2014, real party in interest Rito Tejeda was charged with murder. (Pen. Code, § 187, subd. (a).) On December 3, 2015, respondent court assigned Tejeda's case to Judge Thomas Goethals for all purposes and set the matter for a pre-trial hearing in Judge Goethals' courtroom. That same day, petitioner moved to disqualify Judge Goethals pursuant to section 170.6. The motion was supported by a declaration executed under penalty of perjury by an attorney with the district attorney's office. The declaration represented that Judge Goethals "is prejudiced against the party or the party's attorney, or the interest of the party or party's attorney, such that the declarant cannot, or believes that he/she cannot, have a fair and impartial trial or hearing before the judicial officer."

Later that day, respondent court denied the motion to disqualify Judge Goethals, "without prejudice to the People's or the defendant's right to seek reconsideration of this order, should they choose to do so." Notice of entry of the order was served by mail.

On December 17, 2015, petitioner sought writ relief from this court. (§ 170.3, subd. (d).) This court issued an order to show cause on February 11, 2016, and subsequently set the matter for oral argument.

3

FACTUAL RECORD DEVELOPED BY RESPONDENT COURT

The factual record in this matter is unusual. Petitioner did not submit evidence (other than the standard form § 170.6 declaration) with its motion. Tejeda did not oppose the motion, with evidence or otherwise. Instead, respondent court took judicial notice of facts and events outside the scope of this particular case in supporting its conclusions (1) the district attorney's office was engaged in improper "'blanket papering'" of Judge Goethals in murder cases, and (2) the effect of the blanket challenge was to "substantially disrupt[] the orderly administration of criminal justice in Orange County." We summarize the lengthy recitation of facts from respondent court's order.

Judge Goethals practiced criminal law for more than 20 years, both as a member of the district attorney's office and as a private attorney representing criminal defendants. Since his appointment to the bench in 2003, Judge Goethals has presided over exclusively criminal matters, including "long cause cases" (the most complicated murder cases). "Judge Goethals has prosecuted capital cases, defended capital cases, and . . . presided over capital cases . . . ."

In January 2012, Judge Goethals was assigned the long cause case of *People v. Dekraai*, Superior Court Orange County (2012) No. 12ZF0128. In January 2013, Judge Goethals granted a defense discovery request pertaining to an inmate informant to whom defendant Dekraai had allegedly made incriminating statements. After receiving discovery materials, the defense filed three motions in January and February 2014 (to dismiss the death penalty allegations, to disqualify the district attorney's office based on an alleged conflict of interest, and to exclude from evidence any statements made by Dekraai to the informant). These motions were based on defense allegations that members of the district attorney's office and law enforcement officers had engaged in misconduct (perjury, subornation of perjury, intentional violation of criminal defendants' constitutional rights, and obstruction of justice) in connection with

4

the use of informants. Judge Goethals refused the prosecution's request to deny the motions without an evidentiary hearing.

Judge Goethals began hearing evidence on all three motions on March 18, 2014. On August 4, 2014, Judge Goethals made factual findings that (1) law enforcement officers intentionally moved informants at the jail in an attempt to obtain incriminating statements, and (2) prosecutors had committed negligent violations of *Brady v. Maryland* (1963) 373 U.S. 83. Judge Goethals ruled that Dekraai's statements should be excluded from evidence, but denied the other two motions.[2] However, after new evidence was presented by the defense pertaining to the existence of a computerized system for handling informants, Judge Goethals granted the motion to disqualify the district attorney's office on March 12, 2015.

In the wake of these rulings, the district attorney's use of peremptory challenges against Judge Goethals changed dramatically. The raw numbers are stark. "For over three years, from December 7, 2010 through February 24, 2014, Judge Goethals was assigned 35 murder cases for trial and was disqualified once by the People. From February 25, 2014 through September, 2015, a period of [18] months, Judge Goethals was assigned 49 murder cases for trial and was disqualified 46 times by the People." (Emphasis omitted.) The pattern continued with this case and others assigned to Judge Goethals in December 2015.

Respondent court's order then turned to the consequences of the district attorney's repeated disqualification of Judge Goethals. "Six months after the People began disqualifying Judge Goethals, the negative impact became readily apparent: the four other long cause judges had significantly more murder cases than Judge Goethals. This raised concerns because . . . Penal Code section 1050 requires the judiciary to have courts available for trial at the earliest time possible. Furthermore, . . . the purpose of

---

[2] In two other cases, Judge Goethals found *Brady* violations and disqualified one specific deputy district attorney by rulings announced in February and March 2014.

having a long cause judge—one with a low-enough caseload to allow a seasoned judge to give sufficient time to a murder trial—was being defeated."

Respondent court's multiple efforts to reassign murder cases to Judge Goethals were all rebuffed by section 170.6 challenges from the district attorney's office. "By April, 2015, [respondent court] was in a crisis. New murder cases were being added to its inventory, which included unresolved murder cases. In addition, a backlog of hundreds of other felony cases was becoming a significant problem. Short cause judges were unavailable to try the shorter felony cases because they were presiding over two-to-three-week murder trials. To solve this problem, long cause judges were assigned short cause cases, taking away the time necessary to be devoted to long cause murder cases."

Assignments were shuffled between the various judicial officers at respondent court, in the hope that the blanket challenge phenomenon would be temporary. But it continued unabated through the autumn of 2015.

"[T]he effect of the People's 'blanket' disqualification of Judge Goethals has caused murder cases and other felony cases to languish unnecessarily. It has caused strain in misdemeanor operations. As a result, the court's responsibility to ensure the orderly administration of justice has been severely impacted."

The court observed that it could simply reassign Judge Goethals, but declined to do so: "The very thought of this option is offensive. To allow a party to manipulate the court into removing a judge from hearing certain criminal cases—when that judge, in the performance of his judicial duties, has conducted a hearing which exposed that same party's misconduct—not only goes against the very cornerstone of our society: the rule of law, but would be a concession against judicial independence." (Emphasis omitted.)

DISCUSSION

*Peremptory Challenges Under Section 170.6*

"[S]ection 170.6 provides that no superior court judge shall try any civil or criminal action involving a contested issue of law or fact when it is established that the judge is prejudiced against any party or attorney appearing in the action." (*The Home Ins. Co. v. Superior Court* (2005) 34 Cal.4th 1025, 1031 (*Home Ins. Co.*); see § 170.6, subd. (a)(1).) Of course, "actual prejudice is not a prerequisite to invoking the statute." (*Solberg*, *supra*, 19 Cal.3d at p. 193.) Instead, section 170.6 allows for the disqualification of judges based upon the mere "'belief of a litigant' that he cannot have a fair trial before the assigned judge." (*Solberg*, *supra*, 19 Cal.3d at p. 193; see § 170.6, subd. (a)(2).)

Peremptory challenges under section 170.6 "are presented in the form of a motion, but they fall outside the usual law and motion procedural rules, and are not [in the typical case] subject to a judicial hearing." (*Frisk v. Superior Court* (2011) 200 Cal.App.4th 402, 408.) Within its circumscribed limits, section 170.6 authorizes parties (or their attorneys), rather than courts, to unilaterally decide whether a judge is "prejudiced." (*Home Ins. Co.*, *supra*, 34 Cal.4th at p. 1032 [section 170.6 permits party to obtain disqualification of judge for prejudice based solely upon sworn statement without having to establish prejudice as matter of fact to satisfaction of court].) Courts must honor procedurally sufficient, timely presented section 170.6 motions. (§ 170.6, subd. (a)(4) ["If the motion is duly presented, and the affidavit of declaration . . . is duly filed . . . , thereupon and without any further act or proof, the judge supervising the master calendar . . . shall assign some other judge . . . to try the cause or hear the matter"]; *Stephens v. Superior Court* (2002) 96 Cal.App.4th 54, 59.)

The atypical power conferred upon parties (and their attorneys) by section 170.6 is not "an unconstitutional delegation of legislative and judicial powers to litigants and their attorneys"; nor is it "an unwarranted interference with the powers of the courts."

7

(*Johnson v. Superior Court* (1958) 50 Cal.2d 693, 696 (*Johnson*) [affirming facial constitutionality of § 170.6, which applied only to civil cases at the time].)

*Appellate Court Review of Order Denying Peremptory Challenge*

"An order denying a peremptory challenge is not an appealable order and may be reviewed only by way of a petition for writ of mandate." (*Daniel V. v. Superior Court* (2006) 139 Cal.App.4th 28, 39; see § 170.3, subd. (d).) Hence, there is no adequate remedy at law for rejected section 170.6 motions—filing a writ petition is "the exclusive means of appellate review of an unsuccessful peremptory challenge motion." (*People v. Hull* (1991) 1 Cal.4th 266, 276; see § 1086 [writ of mandate appropriate "where there is not a plain, speedy, and adequate remedy, in the ordinary course of law"].) Even assuming petitioner is required to establish irreparable harm in bringing this statutory writ petition,[3] such harm is obvious in the context of judicial disqualification. (§ 170.6, subd. (a)(1) ["A judge . . . shall not try a . . . criminal action . . . of any kind . . . when it is established as provided in this section that the judge . . . is prejudiced"].) As explained above, a party can disqualify a judge by executing a sworn statement indicating a belief that the party cannot have a fair trial before the assigned judge. Section 170.6 would ring hollow if the moving party were required to prove in a writ petition that the

---

[3] "Some courts may be more inclined to grant a statutory writ without requiring a factual showing of 'inadequate legal remedy' and 'irreparable harm' [citation] . . . on the theory the Legislature has in effect determined these questions in the petitioner's favor by authorizing the writ relief. But this approach is not uniformly adopted. Other courts require the petitioner to affirmatively establish these two prerequisites in all cases, notwithstanding statutory authority for the writ." (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2015) ¶ 15:87, p. 15-46.) Published cases holding that courts have wrongly denied section 170.6 motions do not include an explicit analysis of whether the petitioners in those cases would be irreparably harmed by a failure to provide relief. (See, e.g., *Manuel C. v. Superior Court* (2010) 181 Cal.App.4th 382; *First Federal Bank of California v. Superior Court* (2006) 143 Cal.App.4th 310; *Pandazos v. Superior Court* (1997) 60 Cal.App.4th 324.) This suggests that irreparable harm is either presumed or considered to be unnecessary in section 170.6 writ petitions.

8

disqualification motion would actually make a difference in the outcome of the case (an inherently speculative enterprise) or that the moving party could not successfully move to disqualify the trial judge for cause under section 170.3 (a showing that would undermine § 170.6 by requiring the party to disclose the specific reason for believing the judge was not fair and impartial and to explain why evidence could not be marshaled to disqualify the judge for cause).

It has often been stated that courts review an order denying a section 170.6 motion for an abuse of discretion. (E.g., *Grant v. Superior Court* (2001) 90 Cal.App.4th 518, 523.) This standard of review has meaning in some cases, when there are factual questions that must be sorted out by trial courts before the motion can be granted or denied. For instance, section 170.6, subdivision (a)(4), limits "each side" of a case to one peremptory challenge. It may be unclear in some cases whether "joined parties (e.g., codefendants) are on the same side." (*Orion Communications, Inc. v. Superior Court* (2014) 226 Cal.App.4th 152, 159.)

But a trial court has no discretion to refrain from following binding Supreme Court authority. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455-456; *People v. Franc* (1990) 218 Cal.App.3d 588, 593 ["Although stare decisis doctrine retains some flexibility, it permits only the California Supreme Court, not a lower court, to depart from Supreme Court precedent"].) As acknowledged in respondent court's order, the paramount legal question in this case is the reach of *Solberg*, *supra*, 19 Cal.3d 182: "As a decision of the state's highest court, the holding in *Solberg* must be followed by all inferior California courts. [Citations.] [¶] But is *Solberg*'s holding so broad that it requires all trial courts to grant all timely blanket challenges regardless of the circumstances?" Our review is de novo with regard to the question of whether *Solberg* precludes an inquiry by respondent court into the district attorney's use of section 170.6.

9

In our view, petitioner is entitled to writ relief because *Solberg* cannot be "fairly distinguished" (*Trope v. Katz* (1995) 11 Cal.4th 274, 287) from the factual scenario presented here. Under these circumstances, we conclude *Solberg* precluded respondent court from assessing the motivations and weighing the consequences of the district attorney's peremptory challenges as a basis for denying a section 170.6 motion on separation of powers grounds.

*Solberg—Factual and Procedural Context*

The factual and procedural context of *Solberg*, *supra*, 19 Cal.3d 182, is complicated, with a technical wrinkle that potentially bears on its authoritative power. In four prostitution matters, the deputy district attorney exercised his section 170.6 right to disqualify the assigned municipal court judge prior to hearings scheduled to entertain dismissal motions. The municipal court judge declined to disqualify herself. (*Solberg, supra,* 19 Cal.3d at pp. 187-188.) At superior court writ proceedings initiated by the district attorney, counsel for the municipal court offered to prove that the disqualification motions "were 'blanket challenges' motivated by prosecutorial discontent with [the municipal court judge's] prior rulings of law." (*Id*. at p. 188.) The superior court judge "denied the offer as immaterial" and "quashed subpoenas against the district attorney and his staff for the purpose of eliciting such proof." (*Ibid*.) The superior court judge issued writ relief compelling disqualification of the municipal court judge. This judgment was appealed and the California Supreme Court later granted review. (*Id*. at pp. 188-189.)

Before the superior court judge issued his writ of mandate, two of the four real parties in interest (i.e., the defendants accused of prostitution) filed section 170.6 motions to disqualify the superior court judge. (*Solberg*, *supra*, 19 Cal.3d at p. 188.) The superior court judge denied the motions on two grounds: (1) he was acting as an appellate judge in the matter at issue; and (2) the challenges were filed by real parties in interest (not true parties). (*Id*. at p. 189.) Real parties filed a writ petition with the Court of Appeal to challenge the superior court judge's denial of their section 170.6 motions;

10

"that proceeding [was brought before the Supreme Court] on an alternative writ issued by the Court of Appeal."  (*Solberg, supra,* 19 Cal.3d at p. 189.)

Thus, the *Solberg* court had before it two distinct but related matters—the judgment (a writ of mandate compelling the disqualification of the municipal court judge), and a writ proceeding (seeking a writ of mandate compelling the disqualification of the superior court judge).  The *Solberg* opinion disposed of both disputes.

As to the writ proceeding, the Supreme Court rejected the superior court judge's grounds for refusing to honor section 170.6 motions filed by real parties. (*Solberg*, *supra*, 19 Cal.3d at pp. 189-190.)  "A writ of mandate will therefore lie to compel [the superior court judge] to vacate his order denying the motion for disqualification.  [¶]  All orders made thereafter by [the superior court judge] in these proceedings are likewise void, including the judgment directing issuance of a peremptory writ commanding [the municipal court judge] to disqualify herself in the criminal matters."  (*Id*. at p. 190.)  The last paragraph of the opinion ordered with regard to the writ proceeding:  "[L]et a peremptory writ of mandate issue as prayed."  (*Id*. at p. 204.)

Having determined the superior court judge's orders were void, including the writ of mandate compelling the disqualification of the municipal court judge, the *Solberg* court was not obligated to review the merits of the judgment.  Indeed, the disposition of the appeal in the last paragraph of the opinion was the following:  "the appeal is *dismissed*."  (*Solberg*, *supra*, 19 Cal.3d at p. 204, italics added.)  There was no need to affirm or reverse the judgment; there was no longer any judgment to review.  The opinion could have ended on its fifth page.[4]

---

[4] A contrary argument made by the district attorney at oral argument is that the remainder of the opinion was necessary to the court's decision to issue the writ commanding the superior court judge to recuse himself.  Before indicating a writ would issue, the court stated:  "No question is raised as to either the timeliness or the formal sufficiency of the affidavit of disqualification filed by the real parties in interest; and as hereinafter appears, we have concluded that the statute is constitutional."  (*Solberg,*

11

Instead, the majority opinion continued for 14 additional pages, composed of an in depth review of the constitutionality of section 170.6. The court explained, "the issues presented by the appeal from that judgment will doubtless arise on remand, and we therefore proceed to address their merits." (*Solberg, supra,* 19 Cal.3d at p. 190.)

It is the 14 pages of, strictly speaking, unnecessary analysis that pertains to the separation of powers issue raised in this case. Is this portion of *Solberg* composed solely of dicta? Can it be deemed a holding, despite the fact that it was not necessary to the disposition of the appeal?

"'Only statements necessary to the decision are binding precedents . . . .' [Citation.] 'The doctrine of precedent, or stare decisis, extends only to the ratio decidendi of a decision, not to supplementary or explanatory comments which might be included in an opinion.'" (*Gogri v. Jack in the Box Inc.* (2008) 166 Cal.App.4th 255, 272 [declining to follow dicta of California Supreme Court].) Of course, "it is often difficult to draw hard lines between holdings and dicta." (See *United Steelworkers of America v. Board of Education* (1984) 162 Cal.App.3d 823, 834 (*United Steelworkers*).) In *United Steelworkers*, the appellate court treated a prior Supreme Court's "broad answers to the questions raised by all parties" for guidance "on remand" as a holding. (*Ibid.*) Similarly, in *Solberg* the court intended to instruct the lower court on remand and provided a full account of its reasoning in providing those instructions.

Moreover, "'[e]ven if properly characterized as dictum, statements of the Supreme Court should be considered persuasive. [Citation.]' [Citation.]" (*Hubbard v. Superior Court* (1997) 66 Cal.App.4th 1163, 1169.) "When the Supreme Court has

---

*supra*, 19 Cal.3d at p. 190, italics added.) But nothing in the *Solberg* opinion suggests that the constitutionality of section 170.6 was before it in the writ proceeding. And the court's explanation of why it decided to address the merits of the appeal—because "the issues presented . . . will doubtless arise on remand" (*ibid.*) was unnecessary if the constitutional analysis was necessary to the decision on the writ.

12

conducted a thorough analysis of the issues and such analysis reflects compelling logic, its dictum should be followed." (*Ibid.*)

In sum and on balance, we are bound by *Solberg* in our examination of the separation of powers issue presented. Even if rightly considered dicta, the 14 pages of analysis included in *Solberg* on the separation of powers issue cannot simply be discarded by an inferior court. We need not decide whether the unusual procedural features of *Solberg* would affect our Supreme Court's application of stare decisis principles should it choose to review the instant case.

*Solberg's Separation of Powers Analysis*

As presented to the Supreme Court, the *Solberg* appellants' principal contention was "that section 170.6 is unconstitutional because it violates the doctrine of separation of powers [citation] and impairs the independence of the judiciary [citation]." By not requiring any reasons for disqualification to be stated, "the statute in effect delegates . . . the judicial power to determine whether [a ground for disqualification] exists in the particular case in which it is invoked." (*Solberg*, *supra*, 19 Cal.3d at pp. 190-191.)

*Solberg* rejected appellants' contentions, reaffirming the continuing vitality and applicability to criminal cases of *Johnson*, *supra*, 50 Cal.2d 693, which held 19 years earlier that section 170.6 was constitutional. Point by point, *Solberg* rejected critiques of section 170.6 and *Johnson*. (*Solberg*, *supra*, 19 Cal.3d at pp. 191-193.) After stating actual prejudice is not required to invoke section 170.6, *Solberg* characterized section 170.6 as "'an extraordinary right to disqualify a judge.'" (*Solberg*, *supra*, 19 Cal.3d at p. 193.) Much of the initial analysis discussed asserted abuses of section 170.6 that had only become known after *Johnson*, e.g., judge-shopping (including to avoid a judge whose legal views are not helpful to one's case), use for tactical advantage (including to delay a case, particularly in single-judge courtrooms or single-judge specialty courts), and false swearing of affidavits. (*Solberg*, *supra*, 19 Cal.3d at pp. 194-200.)

13

The appeal was not limited to generalities. It was contended "that the case at bar [was] an example of" the abuses engaged in by counsel. The municipal court judge "dismissed a number of prostitution cases after ruling that the defendants therein were the victims of discriminatory law enforcement practices based on the suspect classification of sex because in each instance only the female prostitute, and not her male customer, was arrested and prosecuted. . . . [P]rostitution charges against the individual real parties in interest herein came before [the municipal court judge] for the purpose of setting a date to hear their motions to dismiss on the same ground. The People moved to disqualify her under section 170.6 allegedly because of a perceived inability to have a fair trial 'in cases of these kinds in this court' [citation]. Appellants assert that the circumstances and wording of the motion show it was primarily based on the People's dissatisfaction with [the municipal court judge's] prior legal ruling on discriminatory law enforcement." (*Solberg*, *supra*, 19 Cal.3d at p. 194, fn. 11.)

The *Solberg* court assumed the charges of abuses were true. It did "not condone such practices, nor [did it] underestimate their effect on the operation of our trial courts." (*Solberg*, *supra*, 19 Cal.3d at p. 195.) But the existence of abuses did not result in the court declaring section 170.6 to be unconstitutional, either in general or as applied to the specific case before it. (*Solberg*, *supra*, 19 Cal.3d at pp. 192-200.)

In addressing the appellants' challenge to the statute, the court did not indicate whether it viewed the challenge to be a "facial" or an "as applied" challenge. Reviewing the discussion, we conclude the court considered it as both. Reliance on *Johnson*, *supra*, 50 Cal.2d 693, suggests a facial challenge analysis. The court also recognized the significant delay in a single-judge court and the inevitable delay in even a multi-judge court that will result from the filing of an affidavit. (*Solberg*, *supra*, 19 Cal.3d at p. 195.) It acknowledged that in multi-branch courts, a disqualification may also result in a desired change in the place as well as the date of trial and "in courts with specialized departments—such as a psychiatric or juvenile department—the statute has

14

been used to remove the judge regularly sitting in that department in the hope of benefiting from the substitution of a less experienced judge." (*Ibid*.) And lastly, the court recognized the statute could be "invoked to intimidate judges generally and in certain cases even to influence the outcome of judicial election campaigns [citation]." (*Ibid*.) After consideration of these various potential abuses, the court concluded it would not hold the statute invalid as applied. (*Ibid*.)

Most pertinent to the petition before us is *Solberg*'s analysis of the contention that *Johnson* was distinguishable because it was a civil case. "The argument is that in all criminal actions the plaintiff and its attorney remain the same, i.e., the People of the State of California represented by the district attorney; the defendant is different in each case, but in most instances is represented by the same counsel, the public defender. This uniformity of either party or counsel assertedly permits the 'institutionalization' of many of the abuses discussed herein, and in particular the abuse known as the 'blanket challenge.' The practice occurs when as a matter of office policy a district attorney or a public defender instructs his deputies to disqualify a certain disfavored judge in all criminal cases of a particular nature . . . or in all criminal cases to which he is assigned. The former policy will prevent the judge from hearing any cases of that type, while the latter policy will force his removal from the criminal bench and his reassignment to a civil department." (*Solberg*, *supra*, 19 Cal.3d at pp. 201-202, fn. omitted.)

*Solberg* flatly rejected the notion that the concerns particular to criminal law made any difference. "[T]his contention is different not in kind but only in degree from the arguments rejected in *Johnson*, and [] the difference does not warrant a contrary result." (*Solberg*, *supra*, 19 Cal.3d at p. 202.) "[T]he possibility of the filing of 'blanket challenges' does not distinguish the present criminal proceeding from *Johnson*, and the reasoning of that decision is equally applicable to the current version of the statute, governing both civil and criminal cases." (*Id*. at p. 204.)

15

*Solberg* rested its analysis regarding blanket challenges on two supports. First, it recalled the "self-limiting aspects of abuse of section 170.6" — i.e., both the technical limits in the statute itself (only one challenge is available to a party and it must be used in a timely fashion) and the offsetting practical concerns of district attorneys (not antagonizing the bench and not delaying the administration of justice and the real possibility the substitute judge who entered the case may be even less satisfactory to the lawyer or his client than the judge whom they disqualify). (*Solberg*, *supra*, 19 Cal.3d at p. 202.) Second, *Solberg* described its prior analysis of blanket challenges in a judicial misconduct opinion (*McCartney v. Commission on Judicial Qualifications* (1974) 12 Cal.3d 512, overruled on other grounds *in Spruance v. Commission on Judicial Qualifications* (1975) 13 Cal.3d 778, 799 & fn. 18 (*McCartney*)). In *McCartney*, the court was critical of blanket challenges but did not indicate that such an abuse "vitiates" section 170.6. (*Solberg*, *supra*, 19 Cal.3d at p. 203.)[5]

In a footnote, *Solberg* specifically addressed the prospect of a blanket challenge forcing a court to remove a judge from a criminal assignment. *Solberg* held

---

[5] *McCartney* observed in a footnote: "The blanket nature of these filings . . . in itself reflects a measure of impropriety. As the objective of a verification is to insure good faith in the averments of a party [citation], the provision in . . . section 170.6 for the showing of prejudice by affidavit requires a *good faith* belief in the judge's prejudice on the part of the individual party or counsel filing the affidavit in *each* particular case. [Citations.] The 'blanket' nature of the written directive issued by the public defender arguably contravened this requirement of *good faith* by withdrawing from each deputy the individual decision whether or not to appear before [a particular judge]. To phrase it another way, the office policy predetermined that prejudice would be claimed by each deputy without regard to the facts in each case handled by the office, thereby transforming the representations in each affidavit into bad faith claims of prejudice." (*McCartney*, *supra*, 12 Cal.3d at p. 538, fn. 13.) But in the text of the opinion, *McCartney* observed, "the Legislature clearly foresaw that the peremptory challenge procedure would be open to such abuses but intended that the affidavits be honored notwithstanding misuse." (*Id*. at p. 538.)

16

that even "this radical consequence" is still distinguishable from cases outside the section 170.6 context in which separation of powers violations were found. (*Solberg*, *supra*, 19 Cal.3d at p. 202, fn. 22.) "The effect of [section 170.6] is at most to remove the individual *judge* assigned to the case or the department, but not to deprive the *court* of the power to hear such cases by assignment of another judge." (*Solberg*, *supra*, 19 Cal.3d at p. 202, fn. 22.)

Nothing in *Solberg* indicates that its analysis was limited to circumstances in which only four challenges were at issue (or that if the *Solberg* appellants had proven that the municipal court judge had been excluded 50 times and that this undermined court operations, such a showing would have been sufficient). Indeed, nothing in *Solberg* leaves room for the consideration of evidence or a different result if the evidence is substantial enough.

Instead, *Solberg* rejected the separation of powers challenge, concluding that abuses committed under the authority of the statute were an "inconsequential price to be paid for the efficient and discreet procedure provided in section 170.6." (*Solberg*, *supra*, 19 Cal.3d at p. 204.) *Solberg* also denied a motion to appoint a referee to take evidence concerning abuses of section 170.6; such evidence "is not material to the disposition" of the appeal because the court assumed the abuses it described were true. These abuses did not render the statute "invalid as applied." (*Solberg*, *supra*, 19 Cal.3d at p. 195, fn. 12.) *Solberg* implicitly, if not explicitly, suggests that courts should not conduct evidentiary hearings (or otherwise marshal evidence on their own, as happened here) to determine the extent of the abuses committed by parties utilizing section 170.6 challenges. Instead, courts should grin and bear this "reasonable—and hence valid—accommodation of the competing interests of bench, bar, and public on the subject of judicial disqualification." (*Solberg*, *supra*, 19 Cal.3d at p. 204.) Any adjustments to this balance should be made by the Legislature. (*Ibid*.)

17

*Solberg* is binding authority. *Solberg* anticipated the circumstances presented here, and its reasoning, as described above, prevents respondent court or this court from entertaining the argument the district attorney's use of peremptory challenges resulted in a separation of powers violation. A writ of mandate must issue compelling respondent court to vacate its order and to assign this case to a different judge.

*The Supreme Court Should Revisit Solberg*

After considering "experience with the statute [in the preceding] decades and as applied . . . in a criminal context" (*Solberg*, *supra*, 19 Cal.3d at p. 187), the *Solberg* court determined the statute did not "'substantially impair' or 'practically defeat' the exercise of the constitutional jurisdiction of the trial courts." (*Id*. at p. 204.) But the court acknowledged future adjustments to this sensitive balance of the competing interests of bench, bar, and public on the subject of judicial disqualification may become necessary or desirable. (*Ibid*.)

Circumstances within our justice system have changed dramatically in the nearly four decades since *Solberg* was decided. Public safety and the constitutional rights of the accused remain primary concerns as courts grapple with increased caseloads, a steady stream of statutory changes, and reduced funding. Examples of statutory changes that have had major impacts on court operations include the Safe Neighborhoods and Schools Act of 2014, the California Criminal Realignment Act of 2011, and the Gang Violence and Juvenile Crime Prevention Act of 1998.

*Solberg* may be "good law," in the sense that it is a binding case that has not been abrogated or reversed, but we question its efficacy in the context of the current reality of the justice system.[6] Broadly speaking, *Solberg* leaves no room to remedy

---

[6] We confine our analysis in this section to the question of whether *Solberg* overreached in its separation of powers analysis with regard to the specific problem of blanket challenges in criminal law cases. We do not take issue with the facial constitutionality of section 170.6 or the desirability in general of section 170.6 as a matter of policy. (Cf. Burg, *Meeting the Challenge:  Rethinking Judicial Disqualification*

18

extraordinary abuses like those apparently perpetrated in the instant case. The holding in *Solberg* (i.e., the exercise of a peremptory challenge under § 170.6 never results in a separation of powers violation, regardless of the extent of the abuse) arguably conflicts with the direction of its separation of powers jurisprudence. (See *Steen v. Appellate Division of Superior Court* (2014) 59 Cal.4th 1045, 1053 [one branch may not "defeat or materially impair the inherent functions of another"]; Carillo and Chou, *California Constitutional Law: Separation of Powers* (2011) 45 U.S.F. L. Rev. 655, 678-681 [California Supreme Court generally approaches separation of powers issues by determining if a core power has been materially impaired].) We posit that the judiciary's core power "'to control its order of business'" and safeguard "'the rights of all suitors'" (*Lorraine v. McComb* (1934) 220 Cal. 753, 756) can be materially impaired if a blanket challenge goes too far.

Case law from another type of constitutional claim shows that the provisions of section 170.6 are not absolute. A section 170.6 challenge made on the basis of the judge's race is subject to an equal protection claim. (See *People v. Superior Court* (*Williams*) (1992) 8 Cal.App.4th 688 (*Williams*).)

In *Williams, supra,* 8 Cal.App.4th at page 695, a criminal defendant alleged that the prosecutor had exercised a peremptory challenge against the (black male) judge based on group bias against blacks. The *Williams* trial judge denied the section 170.6 challenge. (*Williams, supra,* 8 Cal.App.4th at p. 695.) The appellate court issued writ relief requiring the disqualification of the trial judge because the petitioner complied with the "procedural requisites." (*Id.* at pp. 698-699 ["peremptory challenge was thus timely and in proper form, and recusal of [j]udge was mandatory"].) But in doing so, *Williams* expressed the view that "[s]ection 170.6 cannot be employed to disqualify a judge on account of the judge's race. A fortiori, section 170.6 cannot be implemented in such a

(1981) 69 Cal. L. Rev. 1445 [advancing thesis that peremptory challenges are an undesirable solution to problems of judicial disqualification].)

way as to preclude inquiry into whether the statute has been employed to disqualify a judge on account of race." (*Williams, supra,* 8 Cal.App.4th at p. 707.) Section 170.6 challenges based on group bias, a violation of the equal protection clause of the United States Constitution, cannot reasonably be grouped in among the abuses deemed to be mere nuisances in *Solberg*, *supra*, 19 Cal.3d 182. (*Williams*, *supra*, 8 Cal.App.4th at pp. 706-707.) "[A]ny party charging that his adversary has used a section 170.6 challenge in a manner violating equal protection bears the burden of proving purposeful discrimination. [Citation.]" (*Williams, supra,* 8 Cal.App.4th at p. 708.) A prima facie showing of purposeful discrimination was not made in *Williams*. (*Id*. at p. 711.)

If the procedural approach offered by *Williams*, or something similar, were to be adopted in separation of powers cases, only a prima facie showing of improper blanket challenges by a governmental entity would result in the governmental entity being required to justify its use of section 170.6. Respondent court's order reflects that approach to some extent, by offering petitioner the opportunity to present evidence at a hearing in which respondent court would reconsider its denial of the section 170.6 motion. Other states similarly have declined to make peremptory challenge rights absolute when blanket papering becomes a threat to judicial independence. (See *State v. City Court of City of Tucson* (Ariz. 1986) 722 P.2d 267; *People ex rel. Baricevic v. Wharton* (Ill. 1990) 556 N.E.2d 253; *State v. Erickson* (Minn. 1999) 589 N.W.2d 481.)

In addition to the rigid rule it laid down, we also find fault with the specific analysis of the *Solberg* court pertaining to blanket challenges. First, the *Solberg* court was convinced that "the self-limiting aspects of abuse of section 170.6" would come into play before a blanket challenge became a dire threat to the operation of courts. (*Solberg*, *supra*, 19 Cal.3d at p. 202.) But the experience of this case disproves the Supreme Court's deductive logic. For whatever reason, the district attorney appears to be unconcerned with blowback from the blizzard of affidavits filed by the People.

20

Second, the reasoning employed in *Solberg* is offensive to the judiciary. *Solberg* suggests that "unwarranted 'blanket challenges' . . . may well . . . antagonize the remaining judges of the court . . . ." (*Solberg*, *supra*, 19 Cal.3d at p. 202.) This line of thought implies judges will violate their ethical duties, including the duty to "perform the duties of judicial office impartially." (Cal. Code Jud. Ethics, canon 3.) It seems absurd to justify absolute deference to a statute presuming the good faith of attorneys in filing section 170.6 motions by assuming judges will react in bad faith to overuse of the statute.

Third, as to blanket challenges, *Solberg* can fairly be characterized as double dictum. As explained above in this opinion, the entire 14 pages of separation of powers analysis in *Solberg* is arguably dicta. Within the section of the opinion dealing specifically with blanket challenges, *Solberg* placed great stock in the prior analysis of section 170.6 in a *judicial ethics* opinion, *McCartney*, *supra*, 12 Cal.3d 512, not an opinion procedurally situated to assess a separation of powers challenge to the use of a blanket challenge. (*Solberg*, *supra*, 19 Cal.3d at p. 202 [deeming its discussion of *McCartney* to be the "more important[]" of its two lines of argument].) As noted by respondent court in this case, "the broad pronouncement in *McCartney*, on which *Solberg* relied, is, at best, *dictum*."

In sum, we agree with the dissenting view of Justice Tobriner: "the use of 'blanket' challenges under section 170.6 to disqualify a judge because of his judicial philosophy or his prior rulings on questions of law seriously undermines the principle of judicial independence and distorts the appearance, if not the reality, of judicial impartiality. . . . [We] do not believe that the judiciary [should be] helpless to prevent such an abuse of the section 170.6 disqualification procedure, particularly in a case— such as the present one—in which the improper basis of the disqualification motion clearly appears on the face of the record." (*Solberg*, *supra*, 19 Cal.3d at p. 205, dis. opn. of Tobriner, J.)

21

As described by respondent court, the disruption to the operations of that court is not an "'inconsequential price to be paid for the efficient and discreet procedure provided in section 170.6.'" Years of budget cuts to the California trial courts have taken their toll on all court operations. The chaos that has resulted from the abuse of section 170.6 affidavits is all the more troubling because of the judicial branches current funding reality. Like all trial courts, the Orange County Superior Court struggles to perform its constitutional and statutorily mandated functions. As courts work to keep doors open and to provide timely and meaningful access to justice to the public, the extraordinary abuse of section 170.6 is a barrier to justice and its cost to a court should be reconsidered. Like at least one court before us (*Autoland, Inc. v. Superior Court* (1988) 205 Cal.App.3d 857, 861-862), we call on our Supreme Court to reexamine *Solberg*.

## DISPOSITION

Let a peremptory writ of mandate issue directing respondent court (1) to vacate its order denying petitioner's section 170.6 motion and (2) to issue a new and different order assigning this case to a judge other than Judge Goethals. The order to show cause is discharged.


                                                                        O'LEARY, P. J.

I CONCUR:


ARONSON, J.


22

ARONSON, J., Concurring:

As an intermediate appellate court we must follow Supreme Court precedent. This axiom is often misunderstood by the general public, which may assume we are free to decide each case based on our innate sense of what is "right" or what we believe the law should be. In reality, the outcome of many appeals depends on whether an earlier Supreme Court decision covers the matter before us or fairly may be distinguished. Because I conclude the Supreme Court's opinion in *Solberg v. Superior Court* (1977) 19 Cal.3d 182 (*Solberg*) resolves the issues raised here, I join Justice O'Leary's lead opinion that *Solberg* compels us to grant the petition by the People of the State of California (petitioner) for a peremptory writ of mandate directing respondent Superior Court of Orange County (respondent court) to vacate its order denying petitioner's disqualification motion under Code of Civil Procedure section 170.6.[7]

Respondent court denied petitioner's section 170.6 motion because it concluded the motion was part of the Orange County District Attorney's (district attorney) coordinated campaign to "blanket paper" Judge Thomas Goethals to prevent him from hearing murder trials in retaliation for Judge Goethals's rulings in three earlier murder cases. As described more fully in both the lead and dissenting opinions, Judge Goethals found the district attorney's office repeatedly engaged in misconduct in violation of the defendants' constitutional rights, and in one of the cases he found the misconduct created a conflict of interest requiring the office's recusal. Respondent court found the campaign to prevent Judge Goethals from hearing long cause murder trials substantially interfered with the court's ability to administer criminal justice in Orange County, and thereby violated the separation of powers doctrine.

In *Solberg*, however, the Supreme Court concluded blanket papering does not constitute a violation of the separation of powers doctrine even if the widespread

---

[7] All statutory references are to the Code of Civil Procedure.

misuse of section 170.6 prevents a judge from hearing all or certain types of cases. (*Solberg*, *supra*, 19 Cal.3d at pp. 201-204.)  In particular, *Solberg* established the validity of section 170.6 "as applied . . . in a criminal context," despite the fact that institutional parties like the district attorney or public defender may engage in blanket papering. (*Solberg*, at p. 187.)

Although I reach a different result, I agree with several observations Justice Thompson makes in his dissent.  For example, I agree *Solberg* did not inoculate section 170.6 against all conceivable separation of powers challenges, but rather left room for future as applied challenges.  The nature of every as applied challenge is that it must be evaluated on its own merits.  I also agree substantial evidence supports respondent court's conclusion the district attorney engaged in blanket papering of Judge Goethals and did so to retaliate and punish a widely respected and experienced jurist the district attorney previously accepted on a routine basis.  Nonetheless, I cannot agree with the dissent's conclusion *Solberg* does not control the outcome here.

The dissent views *Solberg* as dealing only with a facial challenge to section 170.6, but acknowledges "[e]ven if *Solberg* implied section 170.6 was constitutional as applied to the facts of that case, it is only binding precedent with reference to those facts."  (Dis. opn. at p. 8, fn. 2.)  The dissent also distinguishes the "character and magnitude" of the blanket challenges here from the four challenges lodged in *Solberg*.  (Dis. opn. at pp. 11-13.)  I read *Solberg* differently.  *Solberg* found a quantitative difference in the number of challenges did not violate the separation of powers doctrine, and its broad discussion of blanket challenges shows the Supreme Court did not intend to limit the precedential value of its decision to cases involving few challenges.  *Solberg* acknowledged blanket challenges by the district attorney or public defender might "force" the judge's removal from the criminal bench, presumably because the number of challenges would interfere with the court's operations by diverting more cases to other judges (*Solberg*, *supra*, 19 Cal.3d at p. 202), but *Solberg* concluded this

2

posed no separation of powers violation because reassignment did not deprive the court of the power to hear the case (*id*. at p. 202, fn. 22). Nor did *Solberg* see blanket challenges as a threat to judicial independence, even if "invoked to intimidate judges generally" or used "to influence the outcome of judicial election campaigns." (*Id*. at p. 195.)

In sum, Justice Thompson's analysis may have formed the basis for our decision if we were writing on a clean slate. *Solberg*, however, anticipated the circumstances we face in this case and found that blanket challenges under section 170.6 did not violate the separation of powers doctrine.[8] As explained in the lead opinion,

[8] The dissent and respondent court distinguish *Solberg* on the ground it involved a separation of powers conflict between the legislative and judicial branches of government, but the district attorney's blanket use of section 170.6 in this case involves a conflict between the executive and judicial branches. I disagree.

Respondent court does not challenge the district attorney's use or exercise of any executive power. Rather, the power or right at issue is one the Legislature created and delegated not only to the district attorney, but also to all litigants and attorneys in any civil or criminal action. Absent section 170.6, the district attorney has no inherent executive right or power to disqualify a judge based solely on a suspicion the judge would be biased. It is the express terms of the statute that create the potential for undermining court functions.

Respondent court concluded the unconstitutional interference with its powers arose from the scope and basis for the district attorney's challenges, not from the fact that it was the district attorney making the challenges. Although the public defender is not a member of the executive branch, it too potentially could interfere with the court's powers in the same manner by lodging blanket challenges to a particular judge. Indeed, even a single law firm specializing in an area of civil law potentially could interfere with the court's powers by exercising a blanket challenge to the only judge hearing cases involving that area of the law.

The separation of powers conflict at issue therefore arises between the legislative and judicial branches. Nonetheless, regardless how one views the separation of powers conflict, *Solberg* anticipated the circumstances presented in the present case and found blanket challenges by a district attorney would not create a separation of powers violation.

*Solberg* is binding on this court, and therefore compels us to grant the petition because respondent court abused its discretion in failing to follow *Solberg*'s dictates. (See *People v. Superior Court (Brim)* (2011) 193 Cal.App.4th 989, 991 ["Failure to follow the applicable law is an abuse of discretion"].)

Not only do I agree with Justice O'Leary's conclusion *Solberg* compels us to grant the petition, I also agree with her criticism of *Solberg*'s analysis. I write separately to discuss my further reservations about *Solberg*'s reasoning. Because *Solberg* defined blanket challenges as nothing more than "'bad faith claims of prejudice'" under section 170.6, I question how *Solberg* nevertheless could conclude blanket papering by a district attorney passes constitutional muster. (*Solberg*, *supra*, 19 Cal.3d at p. 203.) Not only is *Solberg* internally inconsistent in ratifying bad faith prejudice claims barred by section 170.6, it also conflicts with the Supreme Court's earlier jurisprudence on the constitutionality of statutes allowing peremptory challenges to individual judges. Based on the district attorney's use of blanket papering in this case and similar tactics in other jurisdictions, this may be an opportune time for the Supreme Court to clarify the constitutional analysis in evaluating whether institutionalized blanket challenges violate the separation of powers doctrine.

*The Predecessor Statute and the Court's Earlier Judicial Disqualification Decisions*

California law long has allowed a party to disqualify the judge assigned to hear a case based on an evidentiary showing and independent judicial determination of bias, prejudice, interest, or other disqualifying characteristic. (*Johnson v. Superior Court* (1958) 50 Cal.2d 693, 696-697 (*Johnson*); *Austin v. Lambert* (1938) 11 Cal.2d 73, 75-76 (*Austin*).) In 1937, however, the California Legislature enacted section 170.5 allowing a party to remove a judge from a case without establishing a disqualifying characteristic or an independent judicial determination. Section 170.5 required the presiding judge to assign a new judge to hear a case when a litigant simply filed a written "peremptory

4

challenge" to the assigned judge. The statute did not require the litigant to state the ground for his or her challenge or to declare under oath that any disqualifying characteristic existed. (*Austin*, at pp. 74-75.) As *Austin* noted, "Nothing is said in the new section about bias, prejudice, interest or any other recognized ground for disqualification." (*Id.* at p. 76.)

In *Austin*, the Supreme Court held section 170.5 unconstitutional as an "unwarranted and unlawful interference with the constitutional and orderly processes of the courts" because it made "the exercise of judicial power, duty and responsibility subject to the whim and caprice of a lawyer or litigant." (*Austin*, *supra*, 11 Cal.2d at pp. 76, 79.) Although it acknowledged the Legislature's authority to establish reasonable regulations concerning the disqualification of a judge (*id.* at pp. 75-76), the Supreme Court nonetheless explained that placing "in the hands of a litigant uncontrolled power to dislodge without reason or for an undisclosed reason, an admittedly qualified judge from the trial of a case in which forsooth the only real objection to him might be that he would be fair and impartial in the trial of the case would be to characterize the statute not as a regulation but as a concealed weapon to be used to the manifest detriment of the proper conduct of the judicial department" (*id.* at p. 79). The court explained this crossed constitutional boundaries because a judge takes an oath to discharge the duties of his office, including the obligation to "determine causes presented to him." (*Id.* at p. 75.) A judge must discharge that duty absent "good cause." (*Ibid.*)

*Austin* recognized that several other states had upheld the constitutionality of statutes that allowed a "so-called 'peremptory challenge'" to a judge, but it distinguished those statutes on the ground they uniformly required the party seeking to disqualify the judge to file a declaration under oath asserting the judge was biased or prejudiced against the party, even though many of the statutes did not allow judicial inquiry into the basis for that assertion. (*Austin*, *supra*, 11 Cal.2d at p. 76.) As the Supreme Court explained, "Such an *ex parte* proceeding has been upheld on the ground

5

that the charge of bias or prejudice under oath is at least an imputation of such disqualification sufficient to save the statute from successful attack on constitutional grounds." (*Id*. at p. 76.)

Nearly 20 years later, the California Legislature enacted section 170.6 modeled after the statutes from other states discussed in *Austin*. (*Solberg*, *supra*, 19 Cal.3d at p. 195.) As originally enacted, section 170.6 only applied to civil actions, but otherwise allowed a party to disqualify a judge in the same manner as the current statute—by filing a declaration under oath asserting the "'party or attorney cannot or believes that he cannot have a fair and impartial trial or hearing before such judge.'" (*Johnson*, *supra*, 50 Cal.2d at p. 701; see *id*. at pp. 695-696.)

Just a year after the statute's enactment, the Supreme Court upheld the facial constitutionality of section 170.6, rejecting a claim the statute violated the separation of powers doctrine and impermissibly interfered with core judicial functions by allowing a litigant or attorney to disqualify a judge for prejudice without requiring a statement identifying the reasons the litigant or attorney believed the judge was prejudiced, without proof of prejudice, and without a judicial determination of the judge's prejudice. (*Johnson*, *supra*, 50 Cal.2d at pp. 695-696.) *Johnson* explained the Legislature has the authority to establish reasonable regulations concerning judicial disqualification, and bias or prejudice long has been a recognized ground for disqualification. *Johnson* also concluded section 170.6 established a permissible means of disqualifying a judge for prejudice, explaining the Legislature's decision to give litigants an opportunity to disqualify a judge solely based on a sworn statement professing the litigant's belief in the judge's prejudice was necessary to insure confidence in the judiciary and avoid the suspicion that might arise in cases where it may be difficult or impossible for the litigant to establish actual prejudice to the satisfaction of a judicial body. (*Johnson*, at p. 697.)

6

Because section 170.6 does not require proof of prejudice, the Supreme Court recognized a litigant may abuse the statute by disqualifying a judge to obtain a perceived litigation benefit, such as a trial continuance while a new judge is assigned or the assignment of a new judge the litigant believes may be more favorable. *Johnson* concluded this potential for abuse did not render the statute unconstitutional because the Legislature determined the statute's benefits outweighed the potential problems caused by these abuses, and the Legislature also included several safeguards in the statute to minimize its abuse, including a requirement the party or its attorney show good faith by declaring under oath that the judge is prejudiced.[9] The Supreme Court found this good faith requirement to be an effective safeguard because the court could not "assume that there will be a wholesale making of false statements under oath." (*Johnson*, *supra*, 50 Cal.2d at p. 697.) Later, the Supreme Court explained *Johnson* "relied heavily" on these statutory safeguards in upholding section 170.6's constitutionality. (*McClenny v. Superior Court* (1964) 60 Cal.2d 677, 685-686.)

One year after *Johnson*, the Legislature amended the statute so that it also would apply to criminal actions. (See *Solberg*, *supra*, 19 Cal.3d at p. 201, fn. 20.)

### Solberg*'s Analysis of Section 170.6*

In *Solberg*, the Supreme Court revisited section 170.6's constitutionality, and again affirmed the statute's validity. (*Solberg*, *supra*, 19 Cal.3d at p. 187.) As in *Johnson*, the court concluded section 170.6 did not violate the separation of powers doctrine or impair the judiciary's independence because the statute and the declaration procedure it established was a reasonable exercise of the Legislature's authority to

---

[9] Other safeguards in section 170.6 include limiting each side in a case to one challenge, placing strict time limits on when to assert a challenge, limiting continuances based upon a request to disqualify a judge, and requiring prompt assignment of a new judge. (*Johnson*, *supra*, 50 Cal.2d at p. 697.)

7

regulate the disqualification of judges. *Solberg* emphasized the declaration under section 170.6 did not establish actual prejudice, nor was actual prejudice required to disqualify a judge under the statute. Rather, section 170.6 merely required the litigant to hold a good faith belief in the judge's prejudice, and the good faith of that belief was established by the litigant declaring the belief under oath. (*Solberg*, at p. 193; *id*. at p. 200 ["we have repeatedly held that the [section 170.6] motion . . . 'requires a *good faith* belief in the judge's prejudice,'" and that good faith is established by declaring that belief under oath because "'the objective of a verification is to insure good faith in the averments of a party'"].)

*Solberg* also considered the courts' experience with section 170.6 during the two decades following *Johnson* to determine whether the statute's actual operation rendered it unconstitutional as applied based on various abuses. (*Solberg*, *supra*, 19 Cal.3d at p. 194.) The Supreme Court acknowledged this experience revealed litigants had invoked section 170.6 for a wide variety of reasons *other than* disqualifying a judge they believed was prejudiced, including removing a judge solely based on the judge's views on the law, delaying a hearing or trial, changing venue, obtaining a less experienced judge, intimidating judges, and even influencing judicial election campaigns. The court also acknowledged these abuses impacted the operation of California's trial courts as they rescheduled and reassigned cases to accommodate the parties' right to have a new judge assigned. (*Solberg*, at pp. 194-195.)

Nonetheless, *Solberg* concluded the impact of these abuses on the courts did not render section 170.6 unconstitutional as applied for two reasons. First, the Supreme Court was aware of these abuses when it first upheld the statute's constitutionality in *Johnson*, and the experience with section 170.6 in the decades following *Johnson* merely "added quantitatively but not qualitatively to [the court's] understanding of the problem." (*Solberg*, *supra*, 19 Cal.3d at p. 196.) As the court had explained in *Johnson*, the Legislature considered these potential abuses of the statute

8

when it enacted section 170.6 and concluded the statute's benefits outweighed the potential problems these abuses posed to the courts. Second, as *Johnson* also explained, the Legislature included safeguards in section 170.6 to minimize these abuses, including requiring the litigant or attorney to show good faith by declaring under oath that the judge is prejudiced. (*Solberg*, at pp. 196-197.) The Supreme Court again observed it would not "'assume that there will be wholesale making of false statements under oath.'" (*Id*. at p. 197.)

Of particular relevance to this case, *Solberg* also considered the constitutionality of section 170.6 as applied in a criminal context and an abuse of the statute unique to criminal cases: the "'blanket challenge.'" (*Solberg*, *supra*, 19 Cal.3d at p. 202.) As defined by *Solberg*, a blanket challenge "occurs when as a matter of office policy a district attorney or a public defender instructs his deputies to disqualify a certain disfavored judge in all criminal cases of a particular nature—such as those involving prostitution or illegal narcotics—or in all criminal cases to which he is assigned." (*Ibid*.) Because the district attorney is the counsel for the plaintiff in all criminal cases and the public defender is the counsel for the defendant in many criminal cases, a blanket challenge can have a much broader impact than other potential abuses under section 170.6 by preventing a judge from hearing any cases of a certain type or even causing the judge's removal from the criminal bench if the district attorney or public defender challenge the judge in nearly every case. (*Solberg*, at pp. 201-202.)

Quoting from an earlier judicial misconduct case involving a judge's intemperate reaction to the public defender's policy challenging the judge in every case, *Solberg* explained a blanket challenge lacks the good faith belief in prejudice that section 170.6 requires in each individual case: "'The "blanket" nature of the written directive issued by the public defender arguably contravened this requirement of *good faith* by withdrawing from each deputy the individual decision whether or not to appear before [Judge McCartney]. To phrase it another way, the office policy predetermined

9

that prejudice would be claimed by each deputy without regard to the facts in each case handled by the office, thereby transforming the representations in each affidavit into bad faith claims of prejudice.'" (*Solberg*, *supra*, 19 Cal.3d at p. 203, quoting *McCartney v. Commission on Judicial Qualifications* (1974) 12 Cal.3d 512, 538, fn. 13, disapproved on other grounds in *Spruance v. Commission on Judicial Qualifications* (1975) 13 Cal.3d 778, 799, fn. 18.)

Although *Solberg* recognized entirely removing a judge from the criminal bench was a "radical consequence" of a blanket challenge, the court concluded the impact of a blanket challenge "is different not in kind but only in degree" from the abuses considered in *Johnson*, "and that difference does not warrant a contrary result." (*Solberg*, *supra*, 19 Cal.3d at p. 202 & fn. 22.) The Supreme Court condemned blanket challenges, but nonetheless concluded that abuse of section 170.6 did not "vitiate[] the statute" because "'the Legislature clearly foresaw that the peremptory challenge procedure would be open to such abuses but intended that the affidavits be honored notwithstanding misuse. [Citation.]' In short, the possibility of the filing of 'blanket challenges' does not distinguish the present criminal proceeding from *Johnson*, and the reasoning of that decision is equally applicable to the current version of the statute, governing both civil and criminal cases." (*Solberg*, at pp. 203-204, fn. omitted.)

Finally, *Solberg* suggested that the potential for misuse of section 170.6 in the criminal context was limited by the nature of the district attorney's and public defender's practice. Because the district attorney's and public defender's entire practice is concentrated before the same criminal judges, they must "realize that . . . if [they or their] deputies file unwarranted 'blanket challenges' against a particular judge the effect may well be to antagonize the remaining judges of the court, one of whom will be

10

assigned to replace their unseated colleague, and the presiding judge, who will make that assignment."[10] (*Solberg*, *supra*, 19 Cal.3d at p. 202.)

## Solberg*'s Inconsistencies*

*Solberg* concluded there was no meaningful distinction between the abuses of section 170.6 considered in *Johnson* and the abuse created by institutionalized blanket challenges in criminal cases, and therefore *Johnson*'s analysis regarding section 170.6's constitutionality compelled the conclusion the statute also was constitutional as applied to a blanket challenge. (*Solberg*, *supra*, 19 Cal.3d at p. 202.) The court's earlier analysis in *Johnson* and *Solberg*'s definition of a blanket challenge as a bad faith claim of prejudice appear at odds with *Solberg*'s conclusion that blanket challenges in criminal cases do not violate the doctrine of separation of powers.

As explained above, *Johnson* and *Solberg* found section 170.6 constitutional because the Legislature may establish reasonable regulations concerning the disqualification of judges, prejudice or bias is a permissible ground for disqualifying a judge, and section 170.6 establishes a reasonable procedure for disqualifying a judge based on prejudice because the statute requires the litigant or attorney to show a good faith belief in the judge's prejudice by stating that belief under oath. (*Solberg*, *supra*, 19 Cal.3d at pp. 191-193.)

In *Austin*, the Supreme Court found the predecessor to section 170.6 unconstitutional because it allowed a party to disqualify a judge without specifying a recognized basis for disqualification or making a showing of any kind. (*Austin*, *supra*, 11 Cal.2d at pp. 75-76, 79.) Providing the Legislature with a roadmap to the elements of

---

[10] I share Justice O'Leary's concern about the court's conclusion that wholesale misuse of section 170.6 would not occur because of the threat judges would retaliate against any attorney or office that misuses the statute. The constitutionality of a statute designed to minimize even the appearance of bias or prejudice cannot turn on the willingness of judges to violate their ethical duty to act impartially.

a constitutional statute, the *Austin* court explained that peremptory disqualification statutes in other states survived constitutional attack because requiring the party to allege bias or prejudice under oath at least imputed a recognized and well-accepted ground for disqualification. (*Id.* at pp. 76-78.)

*Solberg* defined a blanket challenge as a bad faith claim of prejudice because the claim is made based on a general policy determination by the district attorney or public defender rather than a good faith belief the judge is prejudiced in any particular case.[11] (*Solberg*, *supra*, 19 Cal.3d at p. 203.) Under that definition, a blanket challenge to a judge lacks the good faith belief required by section 170.6 and the statute is unconstitutional as applied to that challenge. (See *School Dist. of Okaloosa County v. Superior Court* (1997) 58 Cal.App.4th 1126, 1136-1137 [*Solberg*'s analysis suggests showing of bad faith invalidates section 170.6 motion].) Indeed, if a section 170.6 challenge is made in bad faith, then the statute as applied to that challenge is no different than the statute *Austin* found unconstitutional because the statute permits a litigant or attorney to disqualify an otherwise qualified judge for a reason other than the judge's bias, the only statutorily-recognized ground for disqualification. (See *Austin*, *supra*, 11 Cal.2d at p. 79; *Autoland v. Superior Court* (1988) 205 Cal.App.3d 857, 861-862 [section 170.6 "is nothing more nor less than the old unconstitutional statute recycled with an empty pretension of a sworn statement"].) Nonetheless, current law requires a

---

[11] The Supreme Court's imputation of bad faith to blanket challenges may be over inclusive because under certain circumstances a blanket challenge to a judge could be brought in good faith if the district attorney or public defender reasonably believes the challenged judge is prejudiced against the entire office. That is not the case here, however. As explained above, substantial evidence supports respondent court's finding that the district attorney asserted its blanket challenge to Judge Goethals in retaliation for his legal conclusion in earlier cases that the district attorney engaged in misconduct or prosecutorial error under *Brady v. Maryland* (1963) 373 U.S. 83 and *Massiah v. United States* (1964) 377 U.S. 201. Before those rulings, the district attorney routinely accepted Judge Goethals without question.

court to accept an affidavit of prejudice under section 170.6 even if the attorney lodging the challenge admits to the court the filing is a sham. (See *School Dist. of Okaloosa County*, at pp. 1136-1137.)

Moreover, in both *Solberg* and *Johnson*, the Supreme Court rejected the challenges to section 170.6 based on the many forms of abuse other than a blanket challenge by stating the court would not assume "'there will be a wholesale making of false statements under oath.'"[12] (*Solberg*, *supra*, 19 Cal.3d at p. 197; see *Johnson*, *supra*, 50 Cal.2d at p. 697.) But under *Solberg*'s definition of a blanket challenge, the wholesale making of false statements under oath occurs by definition.

*Conclusion*

The statutory scheme under section 170.6 prohibits a trial court from exploring the reasons a party filed a challenge to a particular judge. A court must accept the challenge, even if the court harbors a reasonable suspicion a party misused the procedure for an impermissible reason. (*Solberg*, *supra*, 19 Cal.3d at p. 198.) As *Solberg* explains, sound reasons support the Legislature's decision to prohibit hearings based on suspicion alone. (*Id.* at pp. 198-200.) But where substantial evidence, rather than reasonable suspicion, exists showing bad faith blanket challenges by the district attorney or public defender, a limited inquiry nonetheless may be warranted. I believe

---

[12] *Solberg* and *Johnson* also rejected the argument that the various abuses of section 170.6 unconstitutionally disrupted court operations, explaining the Legislature considered the abuses and associated problems in enacting the statute and concluded the statute's benefits outweighed those problems. (*Solberg*, *supra*, 19 Cal.3d at pp. 196, 203-204; *Johnson*, *supra*, 50 Cal.2d at p. 697.) Whether the Legislature considered these abuses and problems, however, should not be the governing standard for evaluating a separation of powers challenge. Rather, as *Solberg* recognizes, the appropriate inquiry is whether the statute on its face or in its application substantially impairs the constitutional powers of the courts or practically defeats their exercise. (*Solberg*, at p. 192.)

13

the important issues raised by this case deserve further scrutiny, by the Supreme Court, the Legislature, or both.

ARONSON, J.

**THOMPSON, J.,** Dissenting—I respectfully dissent. The court's decision today transforms Code of Civil Procedure section 170.6 (section 170.6) into "a concealed weapon to be used to the manifest detriment of the proper conduct of the judicial department." (*Austin v. Lambert* (1938) 11 Cal.2d 73, 79.) "'We cannot permit a device intended for spare and protective use to be converted into a weapon of offense and thereby to become an obstruction to efficient judicial administration.' [Citation.]" (*Solberg v. Superior Court* (1977) 19 Cal.3d 182, 198 (*Solberg*).)

Judge King did not abuse his discretion by denying the district attorney's motion to disqualify Judge Goethals under section 170.6. Judge King found their motion ensued from Judge Goethals' misconduct rulings against them. Judge King concluded their motion violated the separation of powers doctrine and undermined the independence of the judiciary. Judge King's factual findings are supported by substantial evidence, his legal conclusion is correct, and his ruling was not arbitrary or capricious.

*Solberg* does not compel a different conclusion. *Solberg* held section 170.6 is constitutional on its face, despite the potential for various types of abuses, including blanket challenge abuses. *Solberg* did not hold the statute was constitutional as applied, or that a district attorney's blanket challenge abuse of the statute cannot violate the separation of powers doctrine. And in any event, *Solberg* can be fairly distinguished from this case, both legally and factually.

## STANDARD OF REVIEW

We review an order denying a section 170.6 peremptory challenge for abuse of discretion. (*Grant v. Superior Court* (2001) 90 Cal.App.4th 518, 523.) "The abuse of discretion standard is not a unified standard; the deference it calls for varies according to the aspect of a trial court's ruling under review. The trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious." (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711-712, fns. omitted.)

# DISCUSSION

*1. Judge King Did Not Abuse His Discretion by Denying the District Attorney's Motion.*

Judge King's factual findings are supported by substantial evidence, his legal conclusion is correct, and his application of the law to the facts was not arbitrary or capricious. Accordingly, Judge King did not abuse his discretion by denying the district attorney's motion to disqualify Judge Goethals.

*a. Judge King's Factual Findings Are Supported by Substantial Evidence.*

Judge King found: (1) the disparity between the district attorney's disqualifications of Judge Goethals before and after February 24, 2014 was not coincidental; and (2) the disparity ensued from Judge Goethals' rulings that prosecutors and police officers had committed misconduct. These factual findings are supported by substantial evidence, as set out below.

The evidence is undisputed.[13] In more than three years before February 24, 2014, Judge Goethals was assigned 35 murder cases and the district attorney disqualified him just once under section 170.6. In roughly 18 months after February 24, 2014, Judge Goethals was assigned 58 murder cases and the district attorney disqualified him 55 times under section 170.6.

This dramatic change in the district attorney's disqualifications of Judge Goethals under section 170.6 coincided with his misconduct rulings against them in three other cases. On February 24, 2014, in two "Mexican Mafia" cases, Judge Goethals found a deputy district attorney intentionally failed to comply with his discovery obligations under *Brady v. Maryland* (1963) 373 U.S. 83, and announced a tentative decision to recuse that deputy district attorney from both cases as a discovery sanction.

---

[13] The evidence consists of facts in the case files and other records of respondent court, or facts that are not reasonably subject to dispute and capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy. Judge King properly took judicial notice of these facts. (Evid. Code, § 452, subds. (d) & (h); *People v. Thomas* (1972) 8 Cal.3d 518, 520, fn. 2.)

Beginning in March 2014 and continuing through March 2015, Judge Goethals conducted a series of extraordinary hearings on defense motions in *People v. Dekraai*, Orange County Superior Court (2012) No. 12ZF0128. The motions alleged several deputy district attorneys and members of law enforcement conspired to commit perjury, suborn perjury, obstruct justice, and intentionally violate the defendant's constitutional rights under *Brady* and *Massiah v. United States* (1964) 377 U.S. 201.

The district attorney conceded the *Massiah* claims and Judge Goethals concluded substantial evidence supported the *Brady* claims. He found two jail deputies either lied or willfully withheld material information. Furthermore, he found the district attorney had an actual conflict of interest which had deprived the defendant of due process. Consequently, Judge Goethals excluded statements the defendant made to the jailhouse informant and recused the district attorney's office in *Dekraai*.

On February 25, 2014—the day after Judge Goethals issued his tentative ruling in the Mexican Mafia cases—the district attorney disqualified him for the first time in a gang murder case. Since then, the district attorney has disqualified him in every gang murder case assigned to him. Likewise, shortly after the *Dekraai* hearings began the district attorney started disqualifying Judge Goethals in nongang murder cases too. The district attorney has since disqualified him in all but three nongang murder cases.

*b. Judge King's Legal Conclusion Is Correct.*

Judge King concluded a district attorney's abuse of section 170.6 can violate the separation of powers and independence of the judiciary clauses of the California Constitution. That is correct, based on basic constitutional principles.

"The California Constitution is 'the supreme law of our state' [citation], subject only to the supremacy of the United States Constitution. (Cal. Const., art. III, § 1.)" (*California Logistics, Inc. v. State of California* (2008) 161 Cal.App.4th 242, 250.) It is axiomatic that all statutes, including section 170.6, must be applied in a manner which is consistent with the California and United States Constitutions.

3

The separation of powers clause of the California Constitution divides the powers of the state government into three branches, and dictates that "[p]ersons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution." (Cal. Const., art. III, § 3.) This clause "is violated when the actions of one branch defeat or materially impair the inherent functions of another." (*Steen v. Appellate Division of Superior Court* (2014) 59 Cal.4th 1045, 1053.)

"The focus in questions of separation of powers is 'the degree to which [the] governmental arrangements comport with, or threaten to undermine, either the *independence and integrity* of one of the branches . . . or the ability of each to fulfill its mission in checking the others so as to preserve the *interdependence* without which independence can become domination.' [Citation.]" (*City of Sacramento v. California State Legislature* (1986) 187 Cal.App.3d 393, 398-399.)

The independence of the judiciary clause (Cal. Const., art. VI, § 1) vests the judicial power of this State in the courts. "One of the powers which has always been recognized as inherent in courts, which are protected in their existence, their powers and jurisdiction by constitutional provisions, has been the right to control its order of business and to so conduct the same that the rights of all suitors before them may be safeguarded." (*Lorraine v. McComb* (1934) 220 Cal. 753, 756.)

Taken together, these basic constitutional principles compel the conclusion that the separation of powers clause prohibits the district attorney (an executive branch agency) from abusing section 170.6 in any manner which materially impairs the inherent powers of the judicial branch. (Cf. *Solberg*, *supra*, 19 Cal.3d at pp. 191-192 [powers of court "can in nowise be trenched upon, lessened or limited by the legislature"].) This conclusion is consistent with the rule that a district attorney cannot take any action under section 170.6 which violates any provision of the constitution. (Cf. *People v. Superior Court* (*Williams*) (1992) 8 Cal.App.4th 688.) It is also consistent with the rule that the authority granted under section 170.6 "'is not absolute and unlimited.'" (*Id*. at p. 698.)

4

*c. Judge King's Ruling Was Not Arbitrary or Capricious.*

Judge King denied the district attorney's motion. He explained: "Due to the nature and the extent of this executive action, this Court has determined that the prosecution's consistent filing of section 170.6 motions in murder cases for more than 18 months is a substantial and serious intrusion into the province of the judiciary. It constitutes a threat to the independence of the Orange County judiciary and a violation of the Separation of Powers provision of the California Constitution."

Judge King's ruling applied the law to the facts. It was not arbitrary or capricious. It did not exceed the bounds of reason, all of the circumstances being considered, and it did not result in any miscarriage of justice. (See *Denham v. Superior Court* (1970) 2 Cal.3d 557, 566.) It was not an abuse of discretion.

*2. Solberg Held Section 170.6 Is Constitutional on its Face.*

In *Solberg*, the court reaffirmed in a criminal context, its earlier decision in *Johnson v. Superior Court* (1958) 50 Cal.2d 693 (*Johnson*), which held in a civil context, that section 170.6 is constitutional on its face.

*Solberg* was a consolidated proceeding which considered a petition for writ of mandate and an appeal. The court granted the petition and issued a writ of mandate on grounds not relevant to this proceeding. (*Solberg*, *supra*, 19 Cal.3d at pp. 189-190, 204.) As a result, the appeal became moot, and the court ultimately dismissed it. (*Id*. at p. 204.) Nevertheless, because the issues raised by the appeal would "doubtless arise on remand," the court addressed them on their merits. (*Id*. at p. 190.)

The underlying facts in *Solberg* were undisputed. "[A] criminal complaint charging Tina Peoples with soliciting an act of prostitution . . . came before Judge Ollie Marie-Victoire . . . . Defense counsel filed a motion to dismiss the charge . . . . At that point Deputy District Attorney Edward Rudloff . . . asked to be sworn and made an oral motion to disqualify Judge Marie-Victoire pursuant to . . . section 170.6. The judge declined to disqualify herself . . . ." (*Solberg*, *supra*, 19 Cal.3d at p. 187, fn. omitted.)

5

"On the same day criminal complaints charging Diana Solberg, Constance Black, and Javette Rollins with soliciting an act of prostitution also came before Judge Marie-Victoire.  In each, defense counsel moved to dismiss; the judge set the matter for hearing in her own department . . . ; Rudloff summarily renewed his motion to disqualify; and the judge summarily denied it."  (*Solberg*, *supra*, 19 Cal.3d at p. 187.)

"On the following day . . . Rudloff filed a formal written motion under section 170.6 to disqualify Judge Marie-Victoire from hearing the foregoing four pending matters.  The motion was supported by his declaration under penalty of perjury substantially in the form prescribed by the statute.  Judge Marie-Victoire denied the written motion on the same ground as she had rejected the oral motions."  (*Solberg*, *supra*, 19 Cal.3d at p. 188, fn. omitted.)

On appeal the appellants "principally contend[ed] that section 170.6 is unconstitutional because it violates the doctrine of separation of powers (Cal. Const., art. III, § 3) and impairs the independence of the judiciary (*Id.*, art. VI, § 1)."  (*Solberg*, *supra*, 19 Cal.3d at pp. 190-191.)  The *Solberg* court responded:  "In [*Johnson*], we rejected these identical arguments in sustaining the constitutionality of the statute.  We have reviewed the decision in the light of the points raised in the present appeal, and we are convinced the opinion of Chief Justice Gibson therein, properly understood, remains sound law.  For the guidance of bench and bar, however, we undertake to restate his reasoning and relate it to the concerns now urged upon us."  (*Id.* at p. 191, fn. omitted.)

A lengthy discussion followed.  At the outset, the *Solberg* court reiterated the basic principle of government underlying the decision in *Johnson*:  "To put the matter affirmatively and more simply, the Legislature may regulate the exercise of the jurisdiction of the courts by all reasonable means."  (*Solberg*, *supra*, 19 Cal.3d at p. 192.)  It then observed, "Applying the foregoing principle in *Johnson*, we held that the disqualification of trial judges is an aspect of the judicial system which is subject to reasonable legislative regulation . . . ."  (*Ibid.*)

6

Next the *Solberg* court addressed the contention "that the experience of the courts with the actual operation of the statute during the past two decades reveals such widespread and persistent abuses thereof as to warrant reconsideration of the question and a holding that section 170.6 is now unconstitutional as applied." (*Solberg*, *supra*, 19 Cal.3d at p. 194.) The court described two principal categories of abuse. "First, section 170.6 has assertedly been invoked for the purpose of 'judge-shopping,' i.e., of removing the assigned judge from the case on grounds other than a belief that he is personally prejudiced within the meaning of the statute." (*Ibid*.) "Second, section 170.6 is said to have been invoked for a variety of purely tactical advantages." (*Id*. at p 195.)

*Solberg* then declared: "We need not lengthen this recital by recounting further examples of asserted abuse of section 170.6 . . . . For present purposes we assume the charges are true. We do not condone such practices, nor do we underestimate their effect on the operation of our trial courts. Nevertheless for a number of reasons we are not persuaded that we should reconsider *Johnson* on this ground and hold the statute invalid as applied." (*Solberg*, *supra*, 19 Cal.3d at p. 195.) The court explained "it is inaccurate to assert that we did not know of these abuses when we decided *Johnson*." (*Ibid*.) "Although we did not pause to catalog the various misuses of the statute, the practices now complained of were clearly within the contemplation of the court. The experience of the ensuing years has added quantitatively but not qualitatively to our understanding of the problem." (*Id*. at p. 196.)

*Solberg* held: "[T]o the extent that abuses persist in the utilization of section 170.6 they do not, in our judgment, 'substantially impair' or 'practically defeat' the exercise of the constitutional jurisdiction of the trial courts. Rather, it may be helpful to view them as a relatively inconsequential price to be paid for the efficient and discreet procedure provided in section 170.6. The statute thus remains a reasonable—and hence valid—accommodation of the competing interests of bench, bar, and public on the subject of judicial disqualification." (*Solberg*, *supra*, 19 Cal.3d at p. 204.)

7

*3. Solberg Did Not Hold Section 170.6 Was Constitutional as Applied.*

*Solberg* did not hold section 170.6 was constitutional as applied to the facts in that case. It is true the court used the words "as applied" three times. Yet a careful review reveals those words were not used in the sense they are relevant here.[14]

First *Solberg* stated: "In these consolidated proceedings we are called upon to reconsider [*Johnson*] in light of the experience with the statute during the intervening two decades and *as applied* here in a criminal context." (*Solberg*, *supra*, 19 Cal.3d at p. 187, italics added.) In this instance, the words "as applied" related to the fact that after *Johnson*, section 170.6 was amended to apply to both criminal and civil cases.

Later *Solberg* said: "It is earnestly contended, however, that *Johnson* is distinguishable [and] . . . that the experience of the courts with the actual operation of the statute during the past two decades reveals such widespread and persistent abuses thereof as to warrant reconsideration of [*Johnson*] and a holding that section 170.6 is now unconstitutional *as applied*." (*Solberg*, *supra*, 19 Cal.3d at p. 194, italics added.) Here the court was merely summarizing a contention.

Then *Solberg* rejected that contention. Specifically, the court held: "We do not condone such practices, nor do we underestimate their effect on the operation of our trial courts. Nevertheless for a number of reasons we are not persuaded that we should reconsider *Johnson* on this ground and hold the statute invalid *as applied*." (*Solberg*, *supra*, 19 Cal.3d at p. 195, fn. omitted, italics added.)

Thus, the court in *Solberg* used the words "as applied" only in reference to events and experiences which occurred after *Johnson*, and only in the process of reconsidering the holding of *Johnson*—that section 170.6 is constitutional on its face— and concluding it "should be reaffirmed." (*Solberg*, *supra*, 19 Cal.3d at p. 187.)

---

[14] Even if Solberg implied section 170.6 was constitutional as applied to the facts of that case, it is only binding precedent with reference to those facts. (*Western Landscape Construction v. Bank of America* (1997) 58 Cal.App.4th 57, 61.)

8

*4. Solberg Did Not Hold Blanket Challenges Cannot Violate the Separation of Powers.*

*Solberg* did not hold a district attorney's blanket challenge abuse of section 170.6 cannot violate the separation of powers doctrine (as between the executive branch and the judicial branch) and undermine the independence of the judiciary to such an extent that the statute is unconstitutional as applied. Nor could this ever be true. Again all statutes, including section 170.6, must be applied in a manner which is constitutional. So I do not agree with the conclusion that *Solberg* controls the outcome here.

*Solberg* only discussed blanket challenge abuses in rejecting the claim, "that *Johnson* is distinguishable because it ruled on the constitutionality of section 170.6 only in a civil setting, and that in a criminal context the statute should be declared invalid primarily because of an asserted difference in the nature of the parties and their counsel." (*Solberg*, *supra*, 19 Cal.3d at p. 201.) To understand this aspect of *Solberg*, we must look at the case it mainly relied upon, *McCartney v. Commission on Judicial Qualifications* (1974) 12 Cal.3d 512, disapproved on other grounds in *Spruance v. Commission on Judicial Qualifications* (1975) 13 Cal.3d 778, 799, footnote 18 (*McCartney*).

*McCartney* considered a recommendation that a judge be removed, rather than censured, for various acts of misconduct. "One of those acts was to engage in angry and excited dialogues with deputy public defenders who filed affidavits of prejudice against him under section 170.6. [Citation.] Among the judge's proffered defenses was a claim that the affidavits were filed pursuant to a policy of the public defender's office to prevent him from presiding over criminal trials." (*Solberg*, *supra*, 19 Cal.3d at p. 203.)

*McCartney* said: "We find this 'defense' to be a slim reed . . . . [¶] [D]isrespect on the part of the public defender cannot serve to justify petitioner's injudicious response. As previously indicated, the Legislature clearly foresaw that the peremptory challenge procedure would be open to such abuses but intended that the affidavits be honored notwithstanding misuse. [Citations.]" (*McCartney*, *supra*, 12 Cal.3d at pp. 537-538, citing, inter alia, *Johnson*, *supra*, 50 Cal.2d at p. 697.)

9

At this point, *McCartney* recited in a footnote: "The blanket nature of these filings, however, in itself reflects a measure of impropriety. As the objective of a verification is to insure good faith in the averments of a party [citation], the provision in . . . section 170.6 for the showing of prejudice by affidavit requires a *good faith* belief in the judge's prejudice on the part of the individual party or counsel filing the affidavit in *each* particular case. [Citations.] The 'blanket' nature of the written directive issued by the public defender arguably contravened this requirement of *good faith* . . . ." (*McCartney*, *supra*, 12 Cal.3d at p. 538, fn. 13.)

This footnote in *McCartney* became a subject of disagreement in *Solberg*. (Compare *Solberg*, *supra*, 19 Cal.3d at pp. 203-204 (maj. opn. of Mosk, J.), with *id*. at pp. 206-207 (conc. & dis. opn. of Tobriner, J.).) Regardless of what one thinks about that disagreement in *Solberg*, the constitutionality of blanket challenges was not an issue in *McCartney*, so at most the *McCartney* court's statements about them are persuasive dicta not binding rulings. (See *Hubbard v. Superior Court* (1997) 66 Cal.App.4th 1163, 1169.) Further, to the extent that *McCartney* said anything about the constitutionality of section 170.6, it merely reiterated the holding of *Johnson*—the statute, as enacted by the Legislature, is constitutional on its face, despite the potential for this type of abuse.

With these thoughts in mind, consider what *Solberg* actually said: "The argument is that in all criminal actions the plaintiff and its attorney remain the same . . . . This uniformity . . . permits the 'institutionalization' of many of the abuses discussed herein, and in particular the abuse known as the 'blanket challenge.'" (*Solberg*, *supra*, 19 Cal.3d at pp. 201-202, fns. omitted.) The court continued, "Upon close analysis we conclude this contention is different not in kind but only in degree from the arguments rejected in *Johnson*, and that the difference does not warrant a contrary result. To begin with, we do not believe the self-limiting aspects of abuse of section 170.6 discussed hereinabove are inoperative in the criminal context." (*Id*. at p. 202.) "More importantly, the issue of 'blanket challenges' is not new to this court." (*Ibid*.)

10

Then *Solberg* commented on the blanket challenge discussion in *McCartney*. "'We acknowledged [citation] that 'the entire policy itself may have been an affront to the court's dignity if it stemmed from public defenders' dissatisfaction with [Judge McCartney's] "hard line" performance as a district attorney rather than a good faith belief in prejudice.' (Italics deleted.) [¶] . . . We felt compelled, nevertheless, to speak to the 'blanket' nature of these filings." (*Solberg*, *supra*, 19 Cal.3d at p. 203.)

*Solberg* concluded, "There is thus no doubt that in *McCartney* we strongly disapproved of the practice of 'blanket challenges,' and we reaffirm that position herein. But it is also manifest from *McCartney* that we do not believe the practice vitiates the statute . . . . In short, the possibility of the filing of 'blanket challenges' does not distinguish the present criminal proceeding from *Johnson*, and the reasoning of that decision is equally applicable to the current version of the statute, governing both civil and criminal cases. [Citation.]" (*Solberg*, *supra*, 19 Cal.3d at pp. 203-204.)

I see nothing in this discussion of blanket challenges which supports the lead opinion conclusion that *Solberg* "prevents respondent court or this court from entertaining the argument that the district attorney's use of peremptory challenges resulted in a separation of powers violation." That the practice does not vitiate the statute on its face does not mean it cannot result in a separation of powers violation as applied.

*5. Solberg Can Be Fairly Distinguished From this Case, Both Legally and Factually.*

Unlike my colleagues, I believe *Solberg* can be "fairly distinguished" (*Trope v. Katz* (1995) 11 Cal.4th 274, 287) from this case, both legally and factually. The analysis and comparison below reveals the separation of powers issues are different, and the character and magnitude of the blanket challenge abuses are different. These legal and factual differences warrant a different result, because the ratio decidendi of *Solberg* simply does not encompass the legal issue or the facts presented in this case. As a result, *Solberg* has little or no force as controlling precedent here. (See generally 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 509, p. 572.)

11

*a. The Separation of Powers Issues Are Different.*

*Solberg* concerned the separation of powers between the legislative branch and the judicial branch. The question was: Did the Legislature violate the separation of powers doctrine when it enacted section 170.6 to regulate the judiciary? On this question *Solberg* reaffirmed the holding of *Johnson* that the statute, as enacted by the Legislature, did not violate the separation of powers doctrine, despite the potential for various types of abuses, including blanket challenges. (*Solberg*, *supra*, 19 Cal.3d at pp. 186-187.)

This case concerns the separation of powers between the executive branch and the judicial branch. The question is: Did the district attorney violate the separation of powers clause when it used section 170.6 to retaliate against a judge? *Solberg* did not consider this question. Again it only considered similar abuses in deciding they do not "vitiate[] the statute" as enacted by the Legislature. (*Solberg*, *supra*, 19 Cal.3d at p. 203.)

Hence, I cannot agree with the lead opinion conclusion that: "In sum and on balance, we are bound by *Solberg* in our examination of the separation of powers issue presented." While the constitutional provisions at issue here and in *Solberg* are the same (Cal. Const., art. III, § 3, art. VI, § 1), the separation of powers questions are not.

*b. The Character of the Blanket Challenge Abuses Are Different.*

In *Solberg*, "the People's motions to disqualify Judge Marie-Victoire in the criminal actions were 'blanket challenges' motivated by prosecutorial discontent with her prior rulings of law." (*Solberg*, *supra*, 19 Cal.3d at p. 188.) They disagreed with her "views on the legal issue relating to the discriminatory enforcement of prostitution laws." (*Id*. at p. 206.)

Here Judge King found the district attorney's motions to disqualify Judge Goethals were motivated by their discontent with his misconduct rulings against them. They were based on the fact he called them out on their misconduct, and they had "the appearance of attempting to intimidate, punish, and/or silence Judge Goethals, and to send a warning to the other local judges that similar rulings will produce a similar fate."

12

In short, the district attorney's disqualification motions were not "premised on the fact that 'the People don't feel that [they] can get a fair trial *in cases of these kinds* in [Judge Goethals'] court.'" (*Solberg*, *supra*, 19 Cal.3d at p. 206.) This is important because, as the court said in *Solberg*, "section 170.6 explicitly recognizes such belief as a sufficient ground for disqualification . . . ." (*Id*. at p. 193.) It does not recognize the desire to intimidate, punish or silence as a sufficient ground for disqualification.

*c. The Magnitude of the Blanket Challenge Abuses Are Different.*

In *Solberg* the district attorney disqualified Judge Marie-Victoire in four prostitution cases. Here the district attorney disqualified Judge Goethals in 55 murder cases. This is noteworthy because while the small number of disqualifications in *Solberg* can be viewed "as a relatively inconsequential price to be paid for the efficient and discreet procedure provided in section 170.6" (*Solberg*, *supra*, 19 Cal.3d at p. 204), the same cannot be said of the comparatively large number of disqualifications here.

## CONCLUSION

The district attorney's systematic abuse of section 170.6 undermined the principle of judicial independence and violated the separation of powers doctrine. We are not powerless to stop it. The petition should be denied.

THOMPSON, J.

13